589 A.2d 1291

**Fielding W. YOST**

v.

**Thomas O. EARLY.**

**No. 1119, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 14, 1991.

---

368

Jerome T. May (Andrea E. Colender and Franch & Jarashow, P.A., on the brief), Annapolis, for appellant.

Robert J. Kim (Danielle M. Cruttenden and McNamee, Hosea, Jernigan & Scott, P.A., on the brief), Greenbelt, for appellee, Early.

Abel J. Merrill (Betty C. Cole, on the brief), Annapolis, for appellee, Saturn Corp.

Argued before BISHOP, FISCHER, JAMES S. GETTY, JJ., (Ret.), Specially Assigned.

BISHOP, Judge.

Thomas O. Early (Early), appellee and cross-appellant, filed a seven count Amended Complaint which named the Saturn Corporation (Saturn) and Fielding Yost (Yost), appellants and cross-appellees, and Martha Ballenger (Ballenger) as defendants. The counts of the Amended Complaint made the following allegations:

Count 1 sought damages against Saturn for the breach of an implied lifetime employment contract with Early;

Count 2 sought damages against Saturn for the wrongful discharge of Early;

Count 3 was a shareholder derivative action which sought damages on behalf of Saturn against Yost and Ballenger for the mismanagement of Saturn and the misappropriation and waste of corporate funds and assets for their personal use with respect to three types of transactions known as (1) Rosepoint, (2) Gator Lube and (3) travel and entertainment;

Count 4 sought damages against Yost and Ballenger for breaches of their fiduciary duties as officers and directors of Saturn;

Count 5 sought damages against Saturn, Yost and Ballenger for the conversion of certain computer programs created by Early and used by Saturn;

Count 6 sought damages against Saturn, Yost and Ballenger under the theory of unjust enrichment based on Saturn's use of the computer programs mentioned in Count 5; and

Count 7 sought damages against Yost and Ballenger for misrepresenting to Early that no one person would own a controlling interest in Saturn.

Saturn, Yost and Ballenger filed motions for summary judgment which the court granted as to Counts 1 and 2. Subsequently, Ballenger was dismissed as a defendant on all Counts.

A jury trial was held on the remaining counts. At the close of Early's case, Saturn and Yost moved for judgment on all counts which the court granted as to Counts 4, 5 and 6. As a result, Saturn was dismissed from the case. Yost rested without calling any witnesses and renewed his motion for judgment on Counts 3 and 7. The court reserved its ruling and Counts 3 and 7 went to the jury. The jury returned a verdict in favor of Yost on Count 7. The jury also returned a verdict in favor of Early on Count 3 and

awarded damages in the amount of $200,000.00 for the Rosepoint transactions. No damages were awarded for the Gator Lube and travel and entertainment transactions. The court then entered its denial of Yost's motion for summary judgment on Count 3. Yost and Early appealed.

## Issues Presented

Appellant Yost presents the following issues on appeal:

I. Whether the court erred when it accepted Michael Olwell as an expert in "computer leasing," allowed Mr. Olwell to state his opinions on "computer leasing," admitted Exhibit No. 91, which contained Mr. Olwell's opinions, and refused to permit appellant to cross-examine Mr. Olwell's qualifications prior to admission of Exhibit No. 91; and

II. Whether the court erred when it denied appellant's motion for judgment on Count 3 (shareholder derivative action).

Cross-appellant Early presents the following issues on cross-appeal:

III. Whether the court erred when it granted summary judgment for Yost and Saturn on Count 1 (breach of employment contract) and 2 (wrongful discharge); and

IV. Whether the court erred when it granted judgment for Yost and Saturn on Counts 5 (conversion) and 6 (unjust enrichment).

## Statement of Facts

The following facts are undisputed. In late 1980, Early met with Yost, Ballenger, Ken Gorsett and Hank Quattro, who were interested in forming a corporation to provide data processing to organizations for use in direct mailings. Early, who was the only computer programmer in the group, knew that the corporation would require computer programs to edit, update and manage data. Since January 1980, Early had been working on programs to perform these tasks.

On May 14, 1981, Saturn was incorporated, and it opened for business on July 1, 1981. Early, who had continued to work on his programs, completed them by July 1981. He referred to them as the EA System. The programs were coded on COBOL coding sheets and yellow sheets of paper. Ballenger, one of Saturn's officers, directors and stockholders, and her staff transferred the code onto magnetic tape. Saturn then returned the coding sheets to Early or discarded them with his consent. In either event, they no longer exist. A copy of the magnetic tape was kept at Saturn. From the magnetic tape, the programs were loaded and stored on a magnetic disc at Papas Computer Services, a business that sold computer use and time. The magnetic disc resided at Papas Computer Services until it was copied onto a magnetic disc and loaded into Saturn's own computer, which Saturn obtained in the Spring of 1982.

In 1985, Saturn decided to upgrade its computer system, but it did not have the resources to purchase the equipment directly and maintain its line of credit at the level needed to finance its operation and growth. Saturn decided to lease the new equipment and it had the option of either a capital lease or an operating lease.[1] If Saturn leased the equipment through a capital lease, it would have to record the lease as a debt which would eliminate its line of credit. Saturn, therefore, leased the new equipment through an operating lease which is not required by generally accepted accounting principles to be recorded as a debt. This way, Saturn was able to maintain the necessary line of credit.

To implement the required leasing arrangement, Yost and his wife, Carolyn, formed a partnership known as Rosepoint Associates (Rosepoint). Rosepoint leased equipment for a three to five year period and then subleased the same equipment to Saturn, through an operating lease, with an

---

**1.** At trial, an operating lease was defined as a lease that (1) is for a term which does not exceed seventy-five percent of the expected useful life of the leased item and (2) pays out less than ninety percent of the leased item's cost. A capital lease was defined as a lease that pays out more than ninety percent of the cost of the leased item.

added fee of twenty percent. The fee charged by Rosepoint was assessed in order to compensate the Yosts for assuming personal liability for the equipment; however, Saturn also guaranteed Rosepoint's lease payments. Saturn was Rosepoint's only customer.

The lease agreements between Saturn and Rosepoint were entered into on an annual basis. The first lease agreement was executed on December 31, 1985, by Yost as president and Early as secretary. A second lease agreement was executed in December 1986, but it was not executed by Early. In January 1987, Early was removed as an officer and director of Saturn and his employment was terminated. Additional lease agreements were executed for the years 1988, 1989 and 1990. Early never sold his stock and continues to own twenty-two percent of Saturn. Additional facts will be included in our discussion of each issue.

## *Discussion*

### I.

Appellant Yost contends that the court erred when it accepted Michael Olwell as an expert in "computer leasing" and admitted his opinions into evidence. We disagree.

Whether a witness is qualified to be an expert witness is a determination within the discretion of the trial court, and it will not be reversed on appeal unless the trial court abused its discretion. *Beahm v. Shortall,* 279 Md. 321, 338–39, 368 A.2d 1005 (1977) (citing *I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 12–15, 344 A.2d 65 (1975)). The standard against which the trial court exercises its discretion is that "a witness may be competent to express an expert opinion if he is reasonably familiar with the subject under investigation, regardless of whether this knowledge is based upon professional training, observation, actual experience, or any combination of these factors." *Radman v. Harold,* 279 Md. 167, 169, 367 A.2d 472 (1977). In other words, "[a] witness is qualified to testify as an expert when he exhibits such a degree of knowledge as to

make it appear that his opinion is of some value" regardless of where the knowledge was gained. *Id.* at 170, 367 A.2d 472 (quoting, *Casualty Ins. Co. v. Messenger*, 181 Md. 295, 298–99, 29 A.2d 653 (1943)). *See also, e.g., Serdenes v. Aetna Life Ins. Co.*, 21 Md.App. 453, 462–64, 319 A.2d 858 *cert. denied*, 272 Md. 748 (1974).

■ Olwell testified that he had structured approximately 250 computer leases a year for the previous eleven years. Included in the structuring of these leases was his determination of whether the lease should be an operating or capital lease. Olwell was also familiar with the accepted accounting procedures necessary to determine whether a lease is structured as operating or capital. Based on this testimony, the court did not abuse its discretion when it qualified Olwell as an expert in "computer leasing."

■ Appellant Yost contends that the court erred when it admitted Olwell's opinions because they confused the jury. Again, we disagree. Early alleged in Count 3 of his complaint that Yost mismanaged Saturn and misappropriated Saturn's funds for his personal use in violation of Md.Corps. & Assoc.Code Ann. § 2–405.1 (1990). Subsection (a)(3) provides that "[a] director shall perform his duties as a director ... [w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances." In this appeal, these allegations center around the lease agreements between Rosepoint and Saturn. Appellants contend that Saturn entered into these lease agreements because Yost was advised by "his accountants" that these were Saturn's only options. Olwell testified that the equipment could have been leased directly as an operating lease by Saturn at a substantial savings.

The admissibility of expert testimony is a matter of discretion for the trial court, and the court's determination will only be reversed if the court has abused its discretion. *Radman*, 279 Md. at 173, 367 A.2d 472. In exercising its discretion, the trial court determines "whether the expert's opinion will aid the trier of fact." *Consol. Mech. Contrac-*

*tors v. Ball,* 263 Md. 328, 338, 283 A.2d 154 (1971) (citations omitted). In the case *sub judice,* it is undisputed that the determination of whether a lease is structured as capital or operating and how that will affect a corporation's financial status is complex and beyond the knowledge of the average layman. Olwell's testimony was relevant because it was evidence that Saturn clearly was not required to lease the computer equipment from Rosepoint at a twenty percent markup and, because of this, Yost was not acting as an ordinarily prudent director in these transactions. We find that the court did not err when it admitted this testimony because Olwell's opinions were an aid to the jury.

■ Next, appellant Yost contends that Exhibit No. 91, which is a four page list of numerous equipment leases and Olwell's opinion as to whether each is an operating or capital lease, was improperly admitted. Appellant Yost again contends that Olwell was unqualified to render his opinion. We remain unpersuaded by this argument. As with Olwell's testimony, Exhibit No. 91 was an aid to the jury's determination of whether Yost violated Md.Corps. & Assoc.Code Ann. § 2–405.1 and, therefore, it was properly admitted.

■ Finally, appellant Yost contends that the court did not allow him to cross-examine Olwell on his qualifications with regard to accepted accounting procedures prior to the admission of Exhibit No. 91. Appellee Early elicited Olwell's qualifications and presented him as an expert in "computer leasing." Yost objected and the court overruled the objection. Yost did not request to voir dire or otherwise examine Olwell, who then testified about computer lease agreements. Appellee Early subsequently moved for admission of Exhibit No. 91. Yost objected on the basis that Olwell was not an expert on the necessary accounting methods and the court sustained the objection. Olwell testified that he was familiar with the accepted accounting procedures that are used to test whether a lease is operating or capital, stated the general rules of the test, and

testified that he used these accepted accounting procedures to determine whether the lease agreements between Saturn and Rosepoint were capital or operating. Appellee Early again moved for admission of Exhibit No. 91 and the following exchange occurred:

> Mr. Kim: Your Honor, I do believe that Mr. Olwell has shown familiarity with FASB 13 [accepted accounting procedures] and the application of the FASB 13.

> Mr. May: I object. I'd like to cross-examine.

> The Court: You'll have a chance to do that. We'll admit it subject to cross.

> The Deputy Clerk: 91.

> (Plaintiff's No. 91 previously marked for identification was received into evidence.)

> The Court: Have you any further questions?

> Mr. Kim: No, Your Honor.

Yost then declined to cross-examine Olwell.

Yost clearly had the right to cross-examine Olwell on his knowledge of the necessary accounting procedures prior to the admission of Exhibit 91. The fact that he did not do so after its admission does not provide us with any basis to hold that the court erred in finding that Olwell's qualifications were sufficient to provide a basis for the admission of the exhibit. *See Beahm,* 279 Md. at 330, 368 A.2d 1005 ("[I]t is firmly established that the complaining party has the burden of showing prejudice as well as error." (Citations omitted)). The court's error in not permitting cross-examination did not affect the outcome of the case and, therefore, it is harmless. *I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 12, 344 A.2d 65 (1975) (citing *Master Royalties Corp. v. Mayor & City Council of Baltimore,* 235 Md. 74, 96, 200 A.2d 652 (1964)). Moreover, we cannot find from the record before us that the trial court abused its discretion in permitting the introduction of the exhibit based on Olwell's qualifications. *See Radman,* 279 Md. at 173, 367 A.2d 472.

## II.

Yost next contends that the court erred when it denied his motion for judgment on Count 3, which alleged that he mismanaged Saturn's affairs and wasted its funds when he executed the lease agreements with Rosepoint. We disagree.

■■■ Count 3, in essence, alleged that Yost did not fulfill the requirements of Md.Corps. & Assoc.Code Ann. § 2–405.1(a) (1990) which provides:

(a) *In general.*—A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

The Attorney General has interpreted § 2–405.1 to be a codification of the business judgment rule, *Savings and Loan Associations,* 62 Op.Att'y Gen. 804, 811–12 (1977), which is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984) (quoted with approval in Hanks, *Maryland Corporation Law* § 6.8, at 172 (1990)). A director is presumed to act in good faith, *Zimmerman v. Bell,* 800 F.2d 386, 392 (4th Cir.1986) (interpreting Maryland law), and the court will not substitute its business judgment for that of the director. *Devereux v. Berger,* 264 Md. 20, 32, 284 A.2d 605 (1972). Contrary to the opinion of the Attorney General, § 2–405.1 and the business judgment rule differ in that the former is the code of conduct for corporate directors, while the latter is an aid to judicial review. *See Maryland Corporation Law* § 6.8, at 172, 174. Nevertheless, the two do overlap. For example, proof of the lack of good faith defeats both the presumption of

the business judgment rule and the requirements of § 2–405.1(a)(1). The better position is to view the business judgment rule as a presumption that corporate directors acted in accordance with § 2–405.1. *See Maryland Corporation Law* § 6.8, at 174.

Although § 2–405.1(a) sets forth the duties of a corporate director, subsections (b) and (c) impose a limitation upon director liability:

(b) *Reliance on information from others.*—(1) In performing his duties, a director is entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by:

(i) An officer or employee of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

(ii) A lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence; or

(iii) A committee of the board on which the director does not serve, as to a matter within its designated authority, if the director reasonably believes the committee to merit confidence.

(2) A director is not acting in good faith if he has any knowledge concerning the matter in question which would cause such reliance to be unwarranted.

(c) *Liability limited.*—A person who performs his duties in accordance with the standard provided in this section shall have the immunity from liability described under § 5–348 of the Courts and Judicial Proceedings Article.[2]

---

**2.** Section 2–405.1(b) and (c) was amended to its present form by the Acts of 1988, 1989 and 1990. None of these amendments altered the liability or lack thereof of the defendants in the case *sub judice.*
    Md.Cts. & Jud.Proc.Code Ann. § 5–348 (1990) provides, "A person who performs the duties of that person in accordance with the

Yost testified that he relied upon the advice of outside accountants and Saturn's corporate attorney who advised him that certain leases that Saturn structured as operating leases were actually capital leases and that it was not in the best interest of the corporation to put the capital leases on the books of Saturn Corporation. Yost further testified that

> it was obvious [that] it was impossible for us to run it as an operational lease, because we couldn't afford the payments. So the—the original discussion was that we—that there would be an ABC corporation, or excuse me, an ABC partnership set up, or something, that later became the name Rosepoint Associates.

Brian Topper, a certified public accountant and comptroller of Saturn, testified that outside accountants had determined that Saturn had entered into certain leases which were capital leases and, therefore, the total debt under the leases had to be recorded as a liability on Saturn's financial statement. This would then limit Saturn's borrowing power. Based upon these discussions, Yost contends that he is shielded absolutely from liability as a corporate director by the provisions of § 2–405.1(b) and (c). We disagree and explain.

■■■■■■ We find no Maryland cases which have interpreted the relationship between the various subsections of § 2–405.1. In this, the initial interpretation of the statute, we must effectuate the intent of the legislature. *Katz v. Wash. Sub. San. Comm.*, 284 Md. 503, 513, 397 A.2d 1027 (1979). The beginning point of statutory construction is the plain language of the statute for this is the legislature's final expression of its intended goal. *Morris v. Prince George's County*, 319 Md. 597, 603, 573 A.2d 1346 (1990). Furthermore, if the language of the statute is sufficiently

---

standard provided under § 2–405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation."

expressive of the legislative purpose or goal, we need go no further. *Id.*

A director's reliance upon the competent information and advice of others, as set forth in § 2–405.1(a) and (b) is a defense to allegations that his or her performance did not meet the requirements of § 2–405.1(a). Therefore, in the case *sub judice,* Yost must present facts to support his claim that he relied upon the advice of outside accountants and Saturn's corporate attorney when he executed the lease agreements between Saturn and Rosepoint because "[i]t is an accepted rule that where a plaintiff has established a *prima facie* case, and the defendant seeks to support his defense by facts which are or ought to be within his knowledge, the burden shifts to him." *District Hgts. Apts. v. Noland Co.,* 202 Md. 43, 50, 95 A.2d 90 (1952). *See also Crowther v. Hirschmann,* 174 Md. 100, 109, 197 A. 868 (1938) (citations omitted) (when the defendant sets up an affirmative defense, he is required to offer legally sufficient evidence of the facts upon which he relies in order to sustain his position).

The burden of proof is upon the defendant director to demonstrate that he or she met the requirements of § 2–405.1(b). The facts presented by Yost were not sufficient to grant his motion for judgment pursuant to Md.Rule 2–519. In *James v. General Motors Corp.,* 74 Md.App. 479, 484–85, 538 A.2d 782 (1988), we considered the application of the rule and stated:

> This Rule [Md.Rule 2–519] makes clear that when ruling on a motion for a judgment the trial judge must consider the evidence, including the inferences reasonably and logically drawn therefrom, in the light most favorable to the party against whom the motion is made.... If there is any evidence, no matter how slight, legally sufficient to generate a jury question, the motion must be denied.... On the other hand, where the evidence is not such as to generate a jury question, *i.e.,* permits but one conclusion, the question is one of law and the motion must be

granted.... An appellate court reviewing the propriety of the grant or denial of a motion for judgment by a trial judge must conduct the same analysis. (Citations omitted)

Moreover, a court cannot "say as a matter of law that one upon whom the burden rests has discharged that burden merely because testimony offered by him was not contradicted. To so hold would be to override the decisions in a long line of cases that the jury has the right to disbelieve a witness even when uncontradicted...." *Thodos v. Bland*, 75 Md.App. 700, 714, 542 A.2d 1307 (1988) (quoting *Smith v. Miller*, 71 Md.App. 273, 278–79, 525 A.2d 245 (1987)). The court properly grants a motion for judgment when the "undisputed" facts are "uncontested," not merely "uncontradicted." *Id.* 75 Md.App. at 715, 542 A.2d 1307.

Appellee Early produced evidence through his expert, Olwell, that Saturn could have obtained its computer equipment under an operating lease at a substantial savings from the lease agreement between Saturn and Rosepoint. Additionally, Early produced evidence that Saturn transferred to Rosepoint a $35,000.00 tax credit for no consideration, that Saturn continued to lease equipment at the rate of approximately $20,000.00 per month for fourteen months beyond the time that Saturn had returned the equipment,[3] and that the significant terms of the lease agreements with Rosepoint were never negotiated by Saturn or voted on by the directors. These facts, when viewed in the light most favorable to Early, are sufficient to overcome the presumptions of the business judgment rule and establish a *prima facie* case that Yost violated the requirements of § 2–405.1(a). The burden then shifted to Yost to prove that he met the requirements of § 2–405.1(b).

---

**3.** Saturn continued to make payments on this equipment even though it was not required to do so under the terms of its lease with Rosepoint, because Rosepoint was obligated to make payments under its lease with a third party.

The evidence is also sufficient to raise the factual issue of whether Yost reasonably relied upon the advice of others and whether that reliance was in good faith. Yost's testimony, that he relied upon the advice of others when he executed the lease agreements between Saturn and Rosepoint, is not sufficient evidence to grant his motion for judgment. The facts are merely "uncontradicted" and not "uncontested" and, therefore, to grant Yost's motion for judgment on this basis would deny the jury its right to judge Yost's credibility. *See, e.g., Zimmerman v. Bell,* 800 F.2d 386, 392 (4th Cir.1986) (in reviewing a director's actions under Maryland law, the circuit court concluded that evidence that directors sought and acted upon outside advice is not dispositive of appropriate actions, but only served to reduce the appearance of self-serving action). Consequently, the court correctly denied Yost's motion for judgment on Count 3.

## III.

Cross-appellant Early, contends that the court erred when it granted appellant Saturn's motion for summary judgment on Counts 1 (Breach of Employment Agreement) and 2 (Wrongful Discharge). Specifically, Early argues that he had an oral contract for lifetime employment with Saturn and therefore, his termination was a breach of that contract. We disagree and explain.

Generally, a corporation is not bound by contracts entered on its behalf prior to its existence. *Franklin Fire Insurance v. Hart,* 31 Md. 59, 65 (1869); 1A *Fletcher Cyclopedia Corporations* § 205, at 418–19 (1983). If the corporation ratifies the contract or accepts its benefits "with full knowledge of the circumstances of their acquisition," however, the corporation is bound by the contract's obligations. *Pullman v. Ray,* 201 Md. 268, 281, 94 A.2d 266 (1953); *C & P Telephone Co. v. Murray,* 198 Md. 526, 530, 84 A.2d 870 (1951); *Winand v. Case,* 154 F.Supp. 529, 538–39 (D.Md.1957). In the case *sub judice,* it is undisput-

ed and uncontested that Saturn never expressly ratified Early's alleged oral contract for lifetime employment. Rather, Early relies upon the fact that Saturn used his EA System software program as evidence that Saturn impliedly ratified the alleged oral contract by accepting its benefits.

■ For a corporation to ratify an alleged oral contract for lifetime employment, the terms of the contract must be definite. "Such contracts at least should be specific and definite, with little or no room for misunderstanding, even if they are not required to be in writing." *Balto. & Ohio R. Co. v. King*, 168 Md. 142, 149, 176 A. 626 (1934) (citations omitted). *See also Winand*, 154 F.Supp. at 542–45.

In *King*, the Court of Appeals reversed, without a new trial, a jury award based on an alleged oral contract for life because the terms were too indefinite to be enforceable. The Court observed the following deficiencies:

> If life employment was intended to be guaranteed, no specific task seems to have been contemplated for it, and no wages were mentioned or agreed upon. Tests of performance appear therefore to be lacking. The parties provided no means by which a court could determine their differences on either subject. While it is true that such informal conversation as that reported might naturally be lacking in specification, the fact does not provide an escape from the requirement of definiteness; it rather tends to indicate that no contract was in the contemplation of the parties.

*King*, 168 Md. at 148–49, 176 A. 626.

■ In its motion for summary judgment, Saturn argued, *inter alia*, that there was no evidence that Early entered into an oral contract for lifetime employment. The motion was supported by the affidavit of Yost. In his opposition to Saturn's motion for summary judgment, Early included his affidavit which made the following statements:

> 2. In anticipation of starting a new business, I created a series of new computer programs called the "EA System". The EA System was created by me on my own

time and I was not compensated by anyone for the creation of the EA System. EA System is the code name for Early–A System.

3. During the meetings prior to incorporation of Saturn, many subjects were discussed, including employment with Saturn, ownership interest in Saturn and control and operation of Saturn.

4. Prior to the incorporation of Saturn, the parties agreed that all the founders of the corporation would be employed by the corporation as long as the corporation was viable and that all the founders would reap the benefits of the corporation in the event the corporation became successful. The agreement among the founders was never changed or amended.

5. Based upon the agreement among the founders, I permitted the EA System to be used by Saturn, and dedicated all of my time and efforts to make Saturn a profitable company.

6. I would not have become a founder, director, officer and an employee of Saturn nor would I have permitted the use of the EA System without an agreement for a long term relationship.

(Apx. to Saturn's brief at 1–2)

Like the oral agreement alleged in *King*, the oral agreement as described by Early in his affidavit is too indefinite to be an oral contract for life employment. None of the specific terms inherent in an employment contract, e.g., job duties, wages and performance guidelines, were discussed or agreed upon. While we recognize that Early was a founding member of Saturn, we find the employment discussions were merely that and did not amount to an oral contract for lifetime employment.

Because the length of Early's employment by Saturn was never specified, he was an employee at will. *Gill v. Computer Equip. Corp.*, 266 Md. 170, 179, 292 A.2d 54 (1972); *Castiglione v. Johns Hopkins Hosp.*, 69 Md.App. 325, 338, 517 A.2d 786 (1986). An employee at will, with

two exceptions not relevant here, may be terminated without cause at any time. *Castiglione,* 69 Md.App. at 338–39, 517 A.2d 786. The parties do not contest that Early was terminated in accord with the requirements of Saturn's by-laws. We hold that Early was an employee at will who was terminated properly by Saturn. Consequently, the court's grant of summary judgment in favor of Saturn on Counts 1 and 2 was correct.

## IV.

Early contends that the court erred when it granted judgment in favor of Saturn and Yost on Counts 5 (conversion) and Count 6 (unjust enrichment). Early's claims are based upon his assertion that he is the owner of the EA System, that Saturn has used the EA System without compensating him and that Saturn refused to return the software programs upon demand. We disagree.

The Federal Copyright Act, 17 U.S.C. § 101, *et seq.* (1990) preempted the field of intellectual property. 17 U.S.C. § 301(a). Under § 102(a), "Copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression ... from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." This has been interpreted to include computer programs. *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1247–54 (3d Cir.1983); *M. Kramer Manf. Co. v. Andrews,* 783 F.2d 421, 432 (4th Cir.1986); 1 *Nimmer on Copyright* § 2.04[c], at 2–43 (1990). The parties do not dispute that the EA System falls within the subject matter governed by the Federal Copyright Act. Early, who never copyrighted his work on the EA System, argues instead that his claims of conversion and unjust enrichment are exceptions to the Federal Copyright Act's preemption. Early relies on § 301(b) which provides in part:

> (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression;  or . . .

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

Section 106 provides that the Federal Copyright Act will protect a copyright owner's exclusive right:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;  and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

The test for determining if a state law is preempted by the Federal Copyright Act is whether "a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like. . . ." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 200 (2d Cir.1983).  Early's claim under the doctrine of unjust enrichment is preempted by the Federal Copyright Act.  Under Maryland law, to sustain a claim under the doctrine of unjust enrichment, three elements must be established:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

*Mass Transit Admin. v. Granite Constr.*, 57 Md.App. 766, 774, 471 A.2d 1121 (1984) (citing *Everhart v. Miles*, 47 Md.App. 131, 136, 422 A.2d 28 (1980)).

An "infringer" always accepts the benefits of the copyrighted work without properly compensating the creator which makes it unjust for the "infringer" to retain the benefits. Therefore, a cause of action for unjust enrichment is an "equivalent right" to those protected under the Federal Copyright Act and is preempted. *See* 1 *Nimmer on Copyrights* § 1.01[B] at 1–22 (1990); *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F.Supp. 1523, 1535–36 (S.D.N.Y.1985) (state law claims of conversion and misappropriation are preempted by the Federal Copyright Act).[4] The court did not have jurisdiction to adjudicate this claim, 28 U.S.C. § 1338(a) (1976),[5] and correctly granted judgment in favor of Saturn and Yost on Count 6.

---

**4.** Early cites to the case of *Schuchart & Associates Professional Engineers, Inc. v. Solo Serve Corp.*, 540 F.Supp. 928, 945–48 (W.D.Tex.1982) which held that a claim under the doctrine of unjust enrichment is not preempted by the Federal Copyright Act. In *Schuchart*, one of the defendants admitted that he copied plaintiffs' copyrighted architectural drawings and utilized them to prepare his own. *Id.* at 935. Plaintiffs sued charging, *inter alia*, that "[d]efendants have been unjustly enriched by their wrongful copying, imitation, transcription and use of [p]laintiffs' architectural drawings...." *Id.* at 934. The court held that the claim was actionable because "[p]laintiffs seek not to enforce their rights to copy and distribute their plans and drawings." Id. at 945. We believe the court erred in its conclusion because § 106(2) specifically protects derivative works prepared from copyrighted works, and we are not bound by its decision.

**5.** § 1338(a) provides:

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plat variety protection, copyrights and trade-marks. Such jurisdiction

Early's claim for conversion must also fail. Early wrote his initial program statements for the EA System on yellow paper and COBOL coding sheets. The parties do not dispute that Early voluntarily gave his EA System coding sheets to Saturn to copy initially in 1981, that Saturn either returned the coding sheets to Early or discarded them with his consent and that Saturn refused to turn over a copy of the EA System, which it had on disc or tape, upon his demand in 1988. Consequently, Early's subsequent demand for the programs which were lawfully in Saturn's possession raises the issue of constructive conversion. *Durst v. Durst,* 225 Md. 175, 178, 169 A.2d 755 (1961). "In order to establish a constructive conversion, ... it is necessary to show a demand for the return of the chattel by the rightful owner, and a refusal by the wrongful holder, or some assertion of an adversary right by the holder." *Id.* at 179, 169 A.2d 755 (citations omitted). *See also Parlett Ford, Inc. v. Sosslau,* 19 Md.App. 320, 322, 311 A.2d 443 (1973), *cert. denied,* 271 Md. 744 (1974). Saturn, however, no longer possessed Early's EA System program sheets because it either had returned them to Early or discarded them with his consent. Early's demand in 1988 was not for his original property, but for its copy. This cannot support an action for constructive conversion. In *Harper & Row,* 723 F.2d at 201, a case that involved the unpermitted copying of a book manuscript, the Second Circuit stated the rule clearly and distinctly:

> Conversion requires not merely temporary interference with property rights, but the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor. *Citizens Nat's Bank v. Osetek,* 353 F.Supp. 958, 963 (S.D.N.Y.1973); *AMF Inc. v. Algo Distributors, Ltd.,* 48 App.Div.2d 352, 356, 369 N.Y.S.2d 460, 464 (2d Dep't 1975); 1 F. Harper & F. James, *The Law of Torts* § 2.15 (1956); *cf. Restatement (Second) of Torts*

---

shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

§ 222A (1965). Merely removing one of a number of copies of a manuscript (with or without permission) for a short time, copying parts of it, and returning it undamaged, constitutes far too insubstantial an interference with property rights to demonstrate conversion. *See Pearson v. Dodd*, 410 F.2d 701, 707 (D.C.Cir.1969), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969).

If Early's claim is for the reproduction of his coding sheets, his conversion claim is preempted by the Federal Copyright Act. If Early's claim is for his original coding sheets, Saturn's interference with his property rights, assuming that Saturn did interfere, was too limited to demonstrate conversion. Under either theory, Early's claim of conversion fails as a matter of law. The court correctly granted judgment in favor of Saturn and Yost on Count 5.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.